**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: _____

BROADSHEET LLC, an Isle of Man entity,

      Petitioner,

To Issue Subpoenas For the Production of
Documents.

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION AND
APPLICATION FOR ORDER UNDER 28 U.S.C. § 1782 PERMITTING PETITIONER
TO ISSUE SUBPOENAS FOR THE PRODUCTION OF DOCUMENTS FROM THE
ESTATE OF EDGAR JEROME JAMES AND RELATED INDIVIDUALS**

---

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND ........................................................................... 4

        A.     The Underlying Asset Recovery Agreement Between Isle of Man-
               Registered Broadsheet (IOM) and the Government, and its Repeated
               Breaches by the Government ................................................................... 4

        B.     The Sham Settlement with the Government Using Deceptive Corporate
               Artifices Established by Mr. James ........................................................ 8

        C.     Broadsheet (IOM) Commences A Foreign Arbitration Against the
               Government and Contemplates Another Arbitration Under the U.K.-
               Pakistan Bilateral Investment Treaty .................................................. 14

III.    SECTION 1782 ENTITLES BROADSHEET TO TAKE DISCOVERY FROM
        RESPONDENTS THAT IS CRITICAL TO BOTH THE NOTICED
        ARBITRATION BEFORE THE CHARTERED INSTITUTE OF
        ARBITRATORS AND THE CONTEMPLATED BIT ARBITRATION ...................... 16

        A.     The Discovery Sought Is Relevant To and Necessary For The Foreign
               Arbitration and Well Within The Scope of The Federal Rules ............ 19

        B.     Respondents Are Not Participants in the Foreign Noticed Arbitration and
               Would Not Be Participants in the Contemplated BIT Arbitration ........ 22

        C.     Bilateral Investment Treaty Arbitral Panels and Private Arbitrators
               Historically Have Been Receptive To Federal Court Assistance Under
               Section 1782 ......................................................................................... 22

        D.     This Petition Is An Attempt To Obtain Probative and Relevant Evidence
               For Foreign Proceedings and In No Way Circumvents Foreign Proof-
               Gathering Restrictions ......................................................................... 24

        E.     The Discovery Requested By This Petition Is Appropriately Focused ............... 25

IV.     CONCLUSION ............................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Fleischmann v. McDonald's Corp.*,
   466 F. Supp. 2d 1020 (N.D. Ill. 2006) ..............................................................15, 18

*In re Application of Hallmark Capital Corp.*,
   534 F. Supp. 2d 951 (D. Minn. 2007)...................................................................16

*In re Application of Imanagement Servs. Ltd.*,
   No. 05-2311, 2006 U.S. Dist. LEXIS 8876 (D.N.J. Feb. 28, 2006) .......................................22

*In re Bayer AG*,
   146 F.3d 188 (3d Cir. 1998)...............................................................................18, 24

*In re Clerici*,
   481 F.3d 1324 (11th Cir. 2007) ...........................................................................18

*In re Letter of Request from Supreme Court of Hong Kong*,
   138 F.R.D. 27 (S.D.N.Y. 1991) ...........................................................................15

*In re Merck & Co.*,
   197 F.R.D. 267 (M.D.N.C. 2000) .........................................................................17

*In re Oxus Gold PLC*, No. MISC 06-82-GEB, 2007 U.S. Dist. LEXIS 24061
   (D.N.J. Apr. 2, 2007) .......................................................................................21

*In re Roz Trading Ltd.*,
   2007 WL 120844 (N.D. Ga. Jan. 11, 2007).............................................................22

*In re Roz Trading Ltd.*,
   469 F. Supp. 2d 1221 (N.D. Ga. 2006) .............................................................16, 22

*In re Schottdorf*,
   2006 U.S. Dist. LEXIS 94161 (S.D.N.Y. Dec. 29, 2006) ......................................17

*In re Winning (HK) Shipping Co.*,
   No. 09-22659-MC, 2010 WL 1796579 (S.D. Fla. Apr. 30, 2010) ....................17, 21

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004)................................................................................ passim

*Metallgesellschaft AG v. Hodapp*,
   121 F.3d 77 (2d Cir. 1997)..................................................................................24

*Minatec Fin. S.A.R.L. v. SI Group Inc.*,
    No. 08-cv- 269, 2008 U.S. Dist. LEXIS 63802 (N.D.N.Y. Aug. 18, 2008) ............................23

*Philips v. Beierwaltes*,
    466 F.3d 1217 (10th Cir. 2006) .............................................................................................15

*Ukrnafta v. Carpatsky Petroleum Corp.*,
    No. 3:09 MC 265 (JBA), 2009 U.S. Dist. LEXIS 109492 (D. Conn. Aug. 27, 2009) ............21

STATUTES

28 U.S.C. § 1782 ...................................................................................................... passim

Companies Acts 1931 (Isle of Man) .............................................................................13

Judicature Act 1883 (Isle of Man) ................................................................................13

Limited Liability Companies Act 1996 (Isle of Man) ..........................................11, 13

NAB Ordinance, 1999 (No. XVIII of 1999) (Pakistan) ..................................................6

## I.     INTRODUCTION

In connection with a noticed foreign arbitration and another contemplated bilateral investment treaty arbitration, Petitioner Broadsheet LLC, an Isle of Man entity ("Broadsheet (IOM)"), petitions this Court for an order pursuant to 28 U.S.C. § 1782 authorizing it to take discovery from the Estate of Edgar Jerome "Jerry" James ("Estate"), Steeplechase Advisors LLC (a/k/a Steeplechase Financial Services LLC and Steeplechase Capital LLC) (collectively, "Steeplechase"), Broadsheet LLC (Colorado) ("Broadsheet (Colorado)"), Sovereign Corporate & Fiscal Services (Colorado) LLC ("Sovereign"), and Douglas M. Tisdale, Sr., Esq. (collectively, "Respondents").  The requested discovery is needed in connection with *Broadsheet LLC v. The National Accountability Bureau of the Islamic Republic of Pakistan*, an arbitration claim noticed under the Rules of the Chartered Institute of Arbitrators, London (to be held in Dublin), by Broadsheet (IOM) against the Government of Pakistan ("the Government").  Broadsheet (IOM) is also invoking the pre-filing consultation procedures for a parallel contemplated investment arbitral claim under the Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Islamic Republic of Pakistan for the Promotion and Protection of Investments," entered into 30 November 1994 (the "UK-Pakistan BIT").

The underlying dispute arises out of a contract entered into on 20 June 2000 by Broadsheet (IOM) and the Government of Pakistan by and through its National Accountability Bureau ("NAB")[1] wherein Broadsheet (IOM) was granted an exclusive and unlimited concession ("Asset Recovery Agreement" or the "Agreement") to recover assets looted from the Pakistani

---

[1] Except where specific reference is made to NAB, the term "Government" should be understood as making reference to the Government of Pakistan acting by and through its agency the NAB.

people by certain high-profile, powerful, and corrupt government officials (the "Targets"). Among many other well-documented breaches, the Government breached the Agreement by failing to fulfill its contractual obligations to assist Broadsheet (IOM) in its duties, and by entering into settlements with certain targets unbeknownst to Broadsheet (IOM), thereby depriving Broadsheet (IOM) of its twenty-percent fee for recoveries obtained from the targets.

Broadsheet (IOM) seeks documents from Respondents chiefly because they almost certainly have within their possession, custody or control documents containing evidence that would prove Broadsheet (IOM)'s efforts to fulfill its obligations under the Agreement with the Government, and to disprove the Government's proffered reasons for its numerous breaches and purported termination. As a secondary matter, Broadsheet also seeks discovery in this action because the late Edgar Jerome "Jerry" James ("Mr. James") appears to have established corporate shell entities in Gibraltar and Colorado also known as Broadsheet LLC ("Broadsheet (Gibraltar)" and "Broadsheet (Colorado)," respectively) in order to support a sham settlement of claims with the NAB to which only the Broadsheet (IOM) entity was rightfully entitled to settle.

Using Broadsheet (Gibraltar) and Broadsheet (Colorado), among other shell corporations that he controlled, Mr. James apparently either deceived the Government, or colluded with the Government or its agents or officials, or benefited from its willful ignorance in entering into a purported settlement of claims—despite the fact that the authentic Isle of Man-registered Broadsheet (IOM) entity had nothing to do with the settlement. Broadsheet (IOM) could not possibly have entered into any settlement because it was dissolved at the time of Mr. James' sham settlement with the Government, and the Manx liquidator did not authorize this settlement

at any time before or after such dissolution.[2]  Only the legitimate Broadsheet (IOM) entity could have terminated the Asset Recovery Agreement and settled Broadsheet (IOM)'s claims against NAB.

Evidence further suggests that Mr. James perpetrated a fraudulent assignment to help prop up the sham settlement with the Government.  Based upon recitals in the sham settlement agreement and his accompanying affidavit, it appears Mr. James secretly attempted to assign (possibly through the use of backdated documents) Broadsheet (IOM)'s rights to pursue its claims against the Government to one or more of his alter ego corporate shell entities just two months before Broadsheet (IOM) was first put into liquidation by the High Court of Justice in the Isle of Man.  Under Manx insolvency law, Mr. James, acting for Broadsheet (IOM), could not lawfully have entered into a lawful assignment of its rights to pursue claims against the Government, as the assignment was purportedly executed immediately before Broadsheet (IOM) was ordered into liquidation.  Such a transfer of Broadsheet (IOM)'s interest in the claim on the eve of liquidation would be voidable under Manx insolvency law as Mr. James was a "connected person" who was attempting to transfer assets for his own benefit.

Broadsheet (IOM) has taken steps to commence an arbitration under the Rules of the Chartered Institute of Arbitrators, London, against the Government concerning its breaches of the Asset Recovery Agreement.  Broadsheet (IOM) is also invoking consultation with the Government in connection with a contemplated arbitral claim under the U.K.-Pakistan bilateral investment treaty based upon violation of treaty provisions requiring fair and equitable treatment

---

[2] Broadsheet (IOM) has since been reinstated in the Isle of Man and is authorized by the current court-appointed liquidator to pursue arbitrations against the Government for its breaches of the Agreement and its obligations under the BIT.

of foreign investors and good faith adherence to contractual terms with U.K.-based entities. Broadsheet (IOM) is thus an "interested person" within the meaning of Section 1782.

Moreover, the targets of this discovery, namely the Estate, Steeplechase, Broadsheet (Colorado), Sovereign, and Douglas M. Tisdale, Sr., Esq., the heavily-involved attorney to Broadsheet (IOM), pre-liquidation, are found within this District. Broadsheet (IOM) thus meets all the statutory criteria for the issuance of an order allowing the requested discovery. *See* 28 U.S.C. § 1782. As set forth herein, all the discretionary factors that this Court may consider likewise favor granting this Petition.

## II.   FACTUAL BACKGROUND

### A.   The Underlying Asset Recovery Agreement Between Isle of Man-Registered Broadsheet (IOM) and the Government, and its Repeated Breaches by the Government

Broadsheet (IOM) and the Government formally entered into the Asset Recovery Agreement in June 2000 after substantial negotiations between the principals of Broadsheet (IOM) and the NAB's Prosecutor General. (*See* Exh. A, Decl. of William F. Pepper, Esq. ("Pepper Decl."), Asset Recovery Agreement ("Agreement").) The Agreement was signed by Broadsheet (IOM) representative, Dr. William F. Pepper, on behalf of Broadsheet (IOM), and by Lt. General Syed Amjad, on behalf of the Government as then-Chairman of the NAB, which is the Pakistani government agency responsible for recovering assets stolen through Pakistani government corruption or diversion by Pakistani government officials. Two companies had been formed to assist NAB pursue the targeted assets worldwide. Broadsheet (IOM), formed by Colorado businessman Mr. James and Dr. Pepper, was empowered by the Agreement to recover assets diverted to the private accounts of the powerful Sharif family and their cooperating

associates.  A separate company not directly relevant to the underlying dispute or this action under Section 1782, entitled "International Asset Recovery Limited" ("IAR"), was formed for the purpose of recovering assets from the Bhutto family.  At varying points in time NAB was dealing with IAR and Broadsheet (IOM) simultaneously.  Broadsheet (IOM) is informed and believes that certain documents relating to IAR may be comingled with those in the possession of the Respondents or are located in the jurisdiction of this Court.  These documents may be relevant to Broadsheet (IOM)'s claims and defenses and thus, are included in the discovery requests set forth in this Petition.

In exchange for Broadsheet (IOM)'s significant investment in establishing a liaison staff in Islamabad, undertaking investigations, and commencing legal actions worldwide, the Government expressly committed to "jointly share" any assets recovered as a result of Broadsheet (IOM)'s efforts *or* as a result of settlements between the Government and any Target. In that regard, the Agreement clarified: "[f]or the removal of any doubt, the share of the assets recovered . . . shall also apply to any settlement by NAB and any registered person or entity *with or without the involvement of Broadsheet."*   (*See* Exh. A, Pepper Decl., Agreement, cl. 4.1 (emphasis added).)   Broadsheet (IOM)'s share of all recoveries and settlements was set at twenty percent.  (*Id*. at cl. 4.2.)  Thus, pursuant to the Asset Recovery Agreement, Broadsheet (IOM) was to receive twenty percent of any amount recovered from the approximately 200 targets that it had been allocated.  (*Id.* at cls. 4.1-4.2.)

In recognition of the substantial investment expected to be made by Broadsheet (IOM) as well as the prospect for an unexpected change in the political support for anti-corruption efforts in the Pakistani government, the parties expressly agreed that a notice of termination would not

affect Broadsheet (IOM)'s continuing rights:  (a) to pursue its recovery efforts for the registered Targets; and (b) to share the recoveries and settlements of registered Targets, whether the recoveries or settlements took place before or after termination of the Agreement.  (Exh. A, Pepper Decl., Agreement, cl. 18.5; Exh. B, Pepper Decl., Affidavit of Farouk Adam Khan ("Khan Aff.") ¶ 7.)   The parties also expressly agreed that notwithstanding the termination provisions set forth in Clauses 18.1-18.4, the Agreement and the Powers of Attorney to pursue registered Targets could not be "revoked" or "modified" until "the last of the Registered Claims has been settled or litigated and reduced to a final, non-appealable judgment" or were "fully collected, paid, settled, or abandoned."  (Exh. A, Pepper Decl., Agreement, cl. 18.7.)   In fulfillment of its contractual duties, Broadsheet (IOM) undertook significant asset-recovery work, incurring expenses upwards of USD 5-7 million and positioning itself to seize substantial assets from several of the Targets.

Well-documented changes in the political climate in Pakistan during this period, however, had much to do with the numerous breaches of the Agreement by the Government, as well as its subsequent purported termination.  At the time the Agreement was made in June 2000, General Pervez Musharraf had recently come to power in a military coup with the declared intention of improving transparency and financial integrity, stamping out the rampant corruption at all levels of Pakistani government, and returning to the Pakistani treasury billions of dollars of assets pilfered by military and civilian government officials during the 1990s.[3]  Building on this anti-corruption crusade, on 16 November 1999, General Musharraf adopted the National Accountability Bureau Ordinance which established the NAB and gave it extraordinary powers

---

[3] *See* C. Gall et al., *For Musharraf, Reduced Power as the President*, N.Y. Times, 29 Nov. 2007, *available at* http://www.nytimes.com/2007/11/29/world/asia/29pakistan.html (last visited 12 Sept. 2011).

to detain alleged corrupt officials and seize their ill-gotten assets.[4]  Unfortunately, the political winds quickly shifted and by late 2000 this anti-corruption crusade was beginning to retreat as part of a backlash from the reforms.[5]  Both Lieutenant General Syed Muhammad Amjad, the founding Chairman of the NAB, and noted Supreme Court advocate Farouk Adam Khan, the first Prosecutor General of NAB, both resigned their positions "due to unacceptable prevailing circumstances,"[6] namely, the beginning of the political shift of the agency's mission from recovery and repatriation of stolen assets to protection and rehabilitation of the corrupt Targets who then reemerged as powerful figures in Pakistani politics.[7]

Thus, approximately two years after NAB and Broadsheet (IOM) entered into the Agreement, the political changes within Pakistan caused the tone of NAB to change drastically from its original anti-corruption mission to an effort to protect Targets from seizure of their property.  It has come to light that NAB had since entered into settlements and plea bargains with numerous targets without notifying Broadsheet (IOM) or paying Broadsheet (IOM) its fee for these targets.  Oftentimes, NAB simply instructed Broadsheet (IOM) to cease its pursuit of these targets.  In one instance, Broadsheet (IOM) froze approximately USD 5 million in the Isle of Jersey belonging to an identified target but was subsequently chastised by the Government to desist in pursuing these assets.  In another instance, the Government reached a settlement directly with a target allegedly valued at USD 25 million but refused to pay Broadsheet (IOM) its

---

[4] *See* NAB Ordinance, 1999 (No. XVIII of 1999).

[5] *See* C. Gall et al., *For Musharraf, Reduced Power as the President*, N.Y. Times, 29 Nov. 2007, *available at* http://www.nytimes.com/2007/11/29/world/asia/29pakistan.html (last visited 12 Sept. 2011).

[6] (Exh. B, Pepper Decl., Affidavit of Farouk Adam Khan ("Khan Aff.")  ¶ 12.)

[7] Griffe Witte, *Popular Former Prime Minister Is Back in Pakistani Politics*, Wash. Post, 27 May 2009, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2009/05/26/AR2009052600554_pf.html  (last visited 12 Sept. 2011)

commission as per the Agreement.  For all of its work over several years, Broadsheet (IOM) was paid only one small fee in connection with a recovery from Admiral Mansour-ul-Haq, one of the listed targets, and the amount paid likely was less than it should have been under the terms of the Agreement.

On 28 October 2003, the Government, through its London solicitors Kendall Freeman, issued a letter attempting to terminate the Agreement on the alleged grounds that Broadsheet (IOM) had made misrepresentations about its abilities and was not carrying out its duties.  (*See* Exh. C, Pepper Decl., Termination Letter.)  In reality, it appears that the Government had settled with a substantial number of the targets without notifying Broadsheet (IOM) or paying its commission under the Agreement.  (*See* Exh. A, Pepper Decl., Agreement, cls. 4.1-4.2.)  But as expressly negotiated by the parties in the Agreement, the Government's 28 October 2003 notice of termination did not extinguish Broadsheet (IOM)'s rights to continue to pursue outstanding targets and to receive its fee for all specified targets, even those recovered by NAB after the termination.  (*See* Exh. A, Pepper Decl., Agreement, cl. 4.1, 18.5.)

**B.     The Sham Settlement with the Government Using Deceptive Corporate Artifices Established by Mr. James**

As a result of the damaging financial effects of the Government's several breaches and purported termination of the Agreement in October 2003, Broadsheet (IOM) was ordered into liquidation in March 2005, as it owed substantial debts to its Jersey advocates and various other service providers.  (Exh. D, Pepper Decl., Order Placing Company into Liquidation and Appointing Provisional Liquidator, 7 Mar. 2005.)

However, it has since come to light that Mr. James was secretly pursuing and negotiating a settlement with the Government purportedly for Broadsheet (IOM)'s claims.  Due to the

change in the political climate within Pakistan, the Government was receptive to simultaneously settling any claims with both IAR and Broadsheet (IOM) because it wished to fully extinguish the exclusive concessions created by the asset recovery agreements with both entities, and apparently recognized that its termination letter of 28 October 2003 did not achieve that result. (*See* Exh. E, Pepper Decl., Letter of Ahmer Bilal Soofi to William F. Pepper, 30 Mar. 2007).  A simultaneous settlement of claims of both IAR and Broadsheet (IOM) was not possible, however, because the High Court of the Isle of Man ordered the dissolution of Broadsheet (IOM) on 2 April 2007.  (Exh. F, Pepper Decl., Order Releasing Liquidator and Dissolving Company, 2 Apr. 2007.)[8]  Thus, between 2 April 2007 and 27 November 2009, Broadsheet (IOM) could not have legally entered into any settlement arrangement with NAB.[9]

Mr. James, the original founder of Broadsheet (IOM), either with the knowledge and participation of the Government or not, concocted a series of fraudulent transactions in a desperate attempt to settle with NAB.  This fraud was completed by his entering into a sham "Settlement Agreement" on 20 May 2008 for the sum of USD 1,500,000, which purported to settle any and all claims of "Broadsheet LLC" against the Government.  In satisfaction of this sham settlement, the High Commission for Pakistan in London made payments directly to Mr. James in the amount of approximately USD 631,626 on or about 20 May 2008 and for the remaining amount of USD 868,374 through Compass Bank, Northglenn, Colorado, on or about

---

[8]  This dissolution was later declared void by the Manx Court on 27 November 2009.  (Exh. K, Pepper Decl., Order Voiding Dissolution, 27 Nov. 2009.)  This court action reinstated Broadsheet (IOM) and appointed a liquidator who then authorized Broadsheet (IOM) to commence arbitrations against the Government and NAB.  (Exh. T, Pepper Decl., Letter of R. Harper to W.F. Pepper, 15 July 2011.)

[9]  Knowing the incapacity of Broadsheet (IOM) to enter into a deal with NAB to settle all claims, IAR alone entered into a settlement agreement on 7 December 2007.  This settlement agreement was expressly and exclusively between IAR and the Government and NAB and exclusively encompassed settlement of only IAR's claims.  It did not refer to or purport to cover the larger, unfulfilled claims of Broadsheet (IOM).

29 September 2008.  (*See* Exh. G, Pepper Decl., Settlement Payment Records.)  Mr. James[10] had

no authority to act on behalf of the only relevant entity—Broadsheet (IOM)—and his confusing

efforts to circumvent this disability were merely a shell game without legal effect.[11]

The sham "Settlement Agreement" and Mr. James's attached affidavit are riddled with

false and deceptive statements designed to cover up the fact that Broadsheet (IOM) had been

dissolved and was incapable of settling with the Government in May 2008.  As an example of his

fraudulent dealing, Mr. James represented in the sham settlement agreement that he was a

shareholder and beneficiary of "Broadsheet LLC under winding-up" and in his affidavit that he

was "fully authorized to execute the Settlement Agreement."  (Exh. H, Pepper Decl., Sham

Settlement Agreement, p. 14, 20 May 2008; Exh. I, Pepper Decl., Affidavit of E. Jerry James in

Support of Purported Settlement Agreement ("James Aff.") ¶ 4, 20 May 2008.)

These representations were false and deceptive.  The only possible company by the name

of Broadsheet LLC "under winding up" was Broadsheet LLC (IOM)—and it was dissolved at

---

[10]  The sham "Settlement Agreement" was signed by Mr. James as "Shareholder and beneficiary of Broadsheet LLC (under winding up)," as Manager of Steeplechase Financial Services LLC ("Steeplechase"), a Colorado company whose date of incorporation and registered office were left conspicuously blank and which is stated to have entered into the shoes of "Broadsheet LLC Gibraltar" and through an assignment received the claims of "Broadsheet LLC under winding-up;" and as Chairman of "Broadsheet LLC," whose date and place of incorporation and location of its registered office were left suspiciously blank.  The document initially defines "BS" to mean this last referenced but conspicuously unidentified Broadsheet entity, but it then says that "BS was also re-incorporated in Denver, Colorado after Broadsheet LLC Gibraltar was under winding-up."  The sham agreement then defines BS as being the entity that had entered into the Agreement with the Government in June 2000 – which we know to be Broadsheet LLC, an Isle of Man entity.  The sham agreement was supported by affidavits under oath by Mr. James and by Mr. Tariq Fawad Malik, who worked with Broadsheet (IOM) in Pakistan.

[11]  The late Mr. James demonstrated a propensity for creating numerous companies with principal mailing addresses or registered addresses at his home address, which, as a sampling, included just within Colorado:  Sovereign Corporate & Fiscal Services (Colorado) LLC, Steeplechase Advisors LLC, Steeplechase Financial Services LLC, Steeplechase Capital LLC, Boaz Foundation, James Foundation, Centennial City Center Corporation, and even a Colorado-incorporated entity named "Broadsheet LLC."  The types of business activities undertaken by many of these entities are unclear.  As demonstrated by the duplicity of the secret, sham settlement, Broadsheet (IOM) has a significant interest in obtaining documents from the Estate concerning the finances of each of these various alter ego entities that were used to perpetuate a fraud on the Government and on Broadsheet (IOM).  The books and records of these various companies are reasonably presumed to be within the possession, custody or control of the Estate.

that time.[12]  Broadsheet (IOM) is a limited liability company that had no shareholders, managers, officers or operating agreement.  The management and profits of Manx LLC entities are vested in "members."   Until 27 November 2009—long after the sham settlement agreement was executed—the only members of Broadsheet LLC (IOM) were two Panamanian corporations, Berkshire International Holdings, Inc. and Oxford International Holdings, Inc.  (Exh. J, Pepper Decl., Articles of Organisation of Broadsheet LLC, 12 May 2000.)  Upon information and belief, neither of these entities provided Mr. James with powers of attorney to act on their behalf in May 2008, or at any time, and if they had, the powers of attorney would have terminated when Broadsheet (IOM) was dissolved on 2 April 2007.  From 2 April 2007 to 27 November 2009 Broadsheet LLC was dissolved and legally incapable of conferring or extending powers of attorney on Mr. James.  Mr. James' signature on the sham settlement agreement as "Chairman" of "Broadsheet LLC" was similarly false and deceptive.  (Exh. H, Pepper Decl., Sham Settlement Agreement p. 14, 20 May 2008.)  Under Manx law, the management of a limited liability company is vested in its members or a manager elected by the members, if provision for such an election is provided in the company's articles of organization.  (Limited Liability Companies Act 1996, §§ 17(1) and (3)).  Significantly, Mr. James could not have exercised any management authority for Broadsheet (IOM) because he was not a member—and Broadsheet (IOM)'s articles of organization made no provision for the election of a manager, much less a "Chairman."  (Exh. J, Articles of Organization of Broadsheet LLC, 12 May 2000.)

---

[12]   The numerous references to "Broadsheet LLC," "Broadsheet LLC (under winding up)," "Broadsheet LLC Gibraltar" and of a "Broadsheet LLC" purportedly incorporated in Colorado were obviously added to confuse the identity of the only entity with a real interest in the Agreement; namely Broadsheet LLC, an Isle of Man entity that we refer to as Broadsheet (IOM) in this memorandum of law.  Until it received a copy of the sham settlement agreement, Broadsheet (IOM) was not aware of any entity by the same name in Gibraltar or Colorado, nor were those entities ever involved in executing or implementing the Agreement.

As another instance of his fraud, Mr. James represented in the sham settlement agreement and in his Affidavit that he was fully authorized to execute the sham settlement agreement "on behalf of BS" which he had defined as the entity that had entered into the Agreement with the Government.  (Exh. I, Pepper Decl., James Aff. ¶ 4, 20 May 2008; Exh. H, Pepper Decl., Sham Settlement Agreement ¶ 24, 20 May 2008.)  He also represented that there "is no reason known to [him] of any existing obstacle or reason which would render the execution of this Settlement Agreement invalid."  (Exh. H, Pepper Decl., Sham Settlement Agreement ¶ 24, 20 May 2008.)  These statements were patently false.  As shown, Mr. James knew he had no powers of attorney to act on behalf of an entity that, at that time, was dissolved.  His representations about "Mr. Tariq Fawad" also having such authority were equally false.  (Exh. I, Pepper Decl., James Aff. ¶¶ 9-10, 20 May 2008.)

Mr. James further represented that "the present claim is neither the subject matter of any winding up proceedings anywhere nor listed as a claim with any liquidator."  (Exh. I, Pepper Decl., James Aff. ¶ 5, 20 May 2008.)  He also represented that "other than Steeplechase no other person or entity has or has had any interest in the claims, demands, obligations or causes of action referred to in the Settlement Agreement."  (Exh. I, Pepper Decl., James Aff. ¶ 12, 20 May 2008.)  These statements were false and deceptive.  Broadsheet (IOM)—not Mr. James, Steeplechase or any other purported Broadsheet LLC entity—has always been the only entity with interest in Broadsheet (IOM)'s claims against the Government and it was dissolved and incapable of entering into a settlement of its claims in May 2008.  Broadsheet (IOM)'s continuing interest in its claims against the Government was explicitly recognized in the 27 November 2009 order of the High Court of Justice of the Isle of Man voiding the dissolution

order of 2 April 2007, reinstating Broadsheet (IOM) to the status of an entity in liquidation, and appointing a liquidator to serve as official receiver in the winding up of the company. (Exh. K, Pepper Decl., Order Voiding Dissolution ¶¶ 1-5, 27 Nov. 2009.) In particular, the November 2009 order noted that Broadsheet (IOM) was reinstated for the purpose of pursuing "the Company's claim against the Government of Pakistan arising from the latter's breach of the terms of the Agreement entered into between the Company and the Government of Pakistan dated 20 June 2000." (Exh. K, Pepper Decl., Order Voiding Dissolution ¶ 5, 27 Nov. 2009.)

Mr. James and the sham settlement agreement falsely alleged that Broadsheet (IOM)'s claims under the Agreement were assigned to Steeplechase Financial Services LLC on 4 January 2005. (Exh. I, Pepper Decl., James Aff. ¶¶ 2, 12, 20 May 2008; Exh. H, Pepper Decl., Sham Settlement Agreement, Recital G, 20 May 2008.) Of course, if this had been a valid assignment, there would have been no need to include Mr. James or any other Broadsheet LLC entity in the sham settlement agreement in 2008. If such an assignment had been attempted in January 2005, it would have required "written consent" of the Government to be effective under Clause 13.1 of the Agreement. (*See* Exh. A, Pepper Decl., Agreement, cl. 13.1.) Given that this also would have constituted an assignment of a chose in action, namely, Broadsheet's right to recover payment of a debt, written notice to the Government as the debtor would also have been required under Section 14(5) of the Isle of Man Judicature Act of 1883. Judicature Act 1883, § 14(5). None of long-time counsel, the liquidators of Broadsheet (IOM), nor most importantly, the then-existing "members" of Broadsheet (IOM) were ever informed about or approved this purported assignment, nor are they aware of any indication that the Government had provided written consent with respect to this purported assignment. As shown, the current liquidator of

Broadsheet (IOM) plainly believes that the claims under the Agreement continue to be an asset of Broadsheet (IOM) in liquidation.[13]

Plainly, even a cursory inspection of the sham settlement and its attached affidavits reveals Mr. James' striking, confusing and inconsistent representations of his authority in this purported settlement.[14]  Broadsheet (IOM) has great need for the documents within Respondents' possession as they will help to show the earnest work of Broadsheet (IOM) in fulfilling its contractual obligations and the Government's numerous breaches, as well as to help prove the invalidity of the 20 May 2008 sham settlement.

**C.     Broadsheet (IOM) Commences A Foreign Arbitration Against the Government and Contemplates Another Arbitration Under the U.K.-Pakistan Bilateral Investment Treaty**

Following unsuccessful attempts to resolve this matter amicably and the Government's unresponsiveness to several prior notices, this proceeding under Section 1782 has been filed in furtherance of Broadsheet (IOM)'s prosecution of its arbitral claims.  Broadsheet (IOM) had previously tendered a "Second Notice of Intention to Proceed to Arbitration," dated 23 October 2009 ("Second Notice"), to the Government, which, together with subsequent correspondence, served to commence the arbitration under the rules of the Chartered Institute of Arbitrators in

---

[13]  Even assuming arguendo that an assignment had taken place in January 2005, as stated by Mr. James, and further assuming that it had been authorized by the members of Broadsheet (IOM)—which it had not—the assignment would have been deemed ineffective under the insolvency laws of the Isle of Man, as it would have constituted a fraudulent preference by a connected person a matter of weeks before Broadsheet (IOM) went into liquidation by court order on 7 March 2005.  Such a fraudulent preference would be deemed null and void and its value would have to revert to the company in insolvency proceedings.  *See* Limited Liability Companies Act 1996, § 31; Companies Acts 1931, § 250.

[14]  Notwithstanding its invalidity, the sham settlement is a glaring admission against interest that the Government believed on 20 May 2008—nearly five years after the alleged termination in 2003—that Broadsheet LLC had a continuing valid claim for damages under the Agreement.  Significantly, in the fourth Recital of the sham settlement, the Government did not deny liability under the Agreement, it merely "disagreed with the amount of [Broadsheet LLC's] claim."  (Exh. H, Pepper Decl., Sham Settlement Agreement, Recital D, 20 May 2008.)

accordance with Clause 7.1 of the Asset Recovery Agreement.  (Exh. L, Pepper Decl., Second Notice to Arbitrate, 23 Oct. 2009.)  For example, a letter of 21 July 2010 to NAB's attorney from predecessor counsel for Broadsheet (IOM), Mr. Seth Taube of Baker Botts LLP, reaffirmed the October 2009 demand for arbitration and sought an immediate meeting with the Government to discuss the dispute.  (Exh. M, Pepper Decl., Letter of Baker Botts LLP to Ahmer Bilal Soofi, 21 July 2010.)

The Government acknowledged this claim by way of letter dated 28 July 2010 from the NAB Chief of Staff, Mr. Muhammad Ashfaq Ashraf, who recognized the pendency of the previously-noticed arbitration claim and advised that "[t]he relevant documents are being looked into and after proper scrutiny of the record an appropriate response would be furnished in due course according to law."  (Exh. N, Pepper Decl., Letter of Muhammad Ashfaq Ashraf to Baker Botts LLP, 28 July 2010.)  Broadsheet (IOM)'s counsel followed up with another letter on 28 September 2010 pressing its intention to arbitrate and proposing three arbitrators.  (Exh. O, Pepper Decl., Letter of Baker Botts LLP to NAB and Ahmer Bilal Soofi, 28 Sept. 2010.)  These actions either commenced the arbitration or demonstrates Broadsheet (IOM)'s intention of doing so.  Nearly one year later, Broadsheet (IOM) has yet to receive any response from the Government to its 28 September 2010 correspondence and the arbitrator has not yet been mutually agreed; and thus, the arbitration tribunal is not yet functioning.

Separately, Broadsheet (IOM) is also invoking the pre-filing consultation procedures for a parallel contemplated investment arbitral claim under the U.K.-Pakistan BIT.

* * *

Upon information and belief, Petitioners recently learned that Mr. James reportedly died on or about 7 May 2011 in Paris, France.   Therefore, Broadsheet (IOM) submits this Petition against the Estate, his widow Susan M. James, Steeplechase, Broadsheet (Colorado), Sovereign, and Broadsheet (IOM)'s attorney, Douglas M. Tisdale, Sr., Esq., primarily to obtain documents relating to (a) the official records of Broadsheet (IOM); (b) the formation, execution, implementation and purported termination of the Agreement between Broadsheet (IOM) and the Government, (c) the purported assignment of the Agreement to one or more of his various shell companies, and (d) Mr. James' negotiation, execution and implementation of the sham Settlement Agreement on behalf of his various shell companies, including the distribution of proceeds from the sham settlement.

### III.   SECTION 1782 ENTITLES BROADSHEET TO TAKE DISCOVERY FROM RESPONDENTS THAT IS CRITICAL TO BOTH THE NOTICED ARBITRATION BEFORE THE CHARTERED INSTITUTE OF ARBITRATORS AND THE CONTEMPLATED BIT ARBITRATION

"Section 1782(a) provides that a district court may order a resident of the district 'to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal.'"   *Philips v. Beierwaltes*, 466 F.3d 1217, 1220 (10th Cir. 2006) (quoting 28 U.S.C. § 1782(a)).   Petitions under Section 1782 are made by application to the Court, and discovery under Section 1782 is liberal.   *See In re Letter of Request from Supreme Court of Hong Kong*, 138 F.R.D. 27, 32 n.6 (S.D.N.Y. 1991); *Fleischmann v. McDonald's Corp.*, 466 F. Supp. 2d 1020,1029 (N.D. Ill. 2006).   Section 1782 requires only a minimal showing to authorize discovery, namely, that (1) the target of discovery resides or "is found" in the district where the petition has been filed; (2) the discovery sought is for use in a proceeding before a foreign or international tribunal; and (3) the petitioner, here Broadsheet (IOM), is an

"interested person." *See, e.g., Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 249, 254-56 (2004).

The statutory requirements for discovery under 28 U.S.C. § 1782 are met here.  First, publicly-available information confirms that Mr. James' surviving widow (and the individuals and entities associated with Mr. James and his Estate from whom Petitioners seeks discovery) reside or are found within this District, as chiefly demonstrated by several entities having their address—and their registered entities' addresses—at Mr. James' home in Englewood.  (Exh. P (Colorado Corporate Record Entry for Steeplechase); Exh. Q (Colorado Corporate Record Entry for Broadsheet LLC (Colorado)); Exh. R (Colorado Corporate Record Entry for Sovereign); Exh. S (Colorado Attorney Record for Douglas M. Tisdale, Sr.), Pepper Decl.)

Second, the discovery Broadsheet (IOM) seeks is for use in the arbitration noticed under the Rules of the Chartered Institute of Arbitrators on 23 October 2009, 21 July 2010, and 28 September 2010.  This arbitration qualifies as a foreign proceeding for purposes of Section 1782. *See, e.g.*, *In re Roz Trading Ltd.*, 469 F. Supp. 2d 1221, 1227 (N.D. Ga. 2006) ("[W]here a body makes adjudicative decisions responsive to a complaint and reviewable in court, it falls within the widely accepted definition of 'tribunal,' the reasoning of *Intel*, and the scope of § 1782(a), regardless of whether the body is governmental or private."); *In re Application of Hallmark Capital Corp.*, 534 F. Supp. 2d 951, 957 (D. Minn. 2007) ("[T]he assistance permissible under Section 1782 may extend to private arbitration bodies.").

In addition, Broadsheet (IOM)'s contemplated claim under the U.K.-Pakistan BIT that will be the subject of consultations with the Government also independently satisfies the requirement that discovery sought through Section 1782 be intended for use in a foreign

proceeding.  *See Intel Corp.*, 542 U.S. at 247 (holding, in part that, following the 1964 amendment of section 1782, and Congress deleting the word "pending," that the "proceeding" for which discovery is sought under § 1782(a) must be in reasonable contemplation, but need not be "pending" or "imminent"); *In re Winning (HK) Shipping Co.*, No. 09-22659-MC, 2010 WL 1796579, *4 (S.D. Fla. Apr. 30, 2010) (noting that "there is no requirement that the foreign proceeding be 'pending' or even 'imminent' as long as the proceeding is 'within reasonable contemplation'").

Third, as the legitimate "Broadsheet" entity registered in the Isle of Man and the only entity duly authorized by the liquidator to pursue the claims against the Government, and as one of the claimants in the noticed Chartered Institute arbitration and would-be claimant in the contemplated U.K.-Pakistan BIT Proceeding, Broadsheet (IOM) is an "interested person" under Section 1782.  *In re Merck & Co.*, 197 F.R.D. 267, 270 (M.D.N.C. 2000) (finding that "interested persons" include parties to international proceedings).

There is thus no question that this Petition meets the statutory requirements for discovery under Section 1782, and this Court has discretion to grant the discovery requested.  Courts "exercise their discretion under § 1782 in light of the twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *In re Schottdorf*, 2006 U.S. Dist. LEXIS 94161, *13 (S.D.N.Y. Dec. 29, 2006) (citations and quotations omitted).  If the information sought is relevant, the presumption under Section 1782 is in favor of discovery.  *In re Bayer AG*, 146 F.3d 188, 195-96 (3d Cir. 1998) ("[R]elevant evidence is presumptively discoverable under § 1782[.]").

* * *

Beyond relevance, the United States Supreme Court has further directed district courts to consider four factors in exercising their discretion to grant a Section 1782 petition: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the receptivity of the foreign tribunal to federal-court assistance; (3) whether the request conceals an attempt to circumvent foreign proof-gathering restrictions; and (4) whether the request is unduly intrusive or burdensome. *See Intel Corp.*, 542 U.S. at 264-65. As detailed below, each discretionary factor weighs in favor of granting the requested discovery.

## A. The Discovery Sought Is Relevant To and Necessary For The Foreign Arbitration and Well Within The Scope of The Federal Rules

The discovery sought here plainly falls within the scope of Section 1782. Under Section 1782, discovery may be as broad and liberal as the Federal Rules allow. *See Fleischmann*, 466 F. Supp. 2d at 1029; *In re 28 U.S.C. § 1782*, 249 F.RD. 96, 106 (S.D.N.Y. 2008). In fact, discovery can be granted under Section 1782 even when it would extend beyond that which is allowed under the Federal Rules. *Intel Corp.*, 542 U.S. at 263; *In re Clerici*, 481 F.3d 1324, 1333 n.12 (11th Cir. 2007). Because the Government and Mr. James purported to enter into a settlement of claims that only Broadsheet (IOM) was rightfully authorized to settle, Broadsheet (IOM) believes that Mr. James necessarily had within his possession documents that would help Broadsheet (IOM) prove its good-faith performance under the Agreement and disprove the Government's cited bases for its breaches and purported termination thereof. Broadsheet (IOM) thus has a critical need for the documents that Mr. James used to extract his sham settlement in order to understand the reasons for the Government agreeing to settle with Mr. James, as well as to comprehend the full extent of Mr. James' dishonest conduct. Mr. James and the Respondents,

especially Mr. Tisdale, also retained portions of the official records of Broadsheet (IOM), which the company now wants to retrieve.

Notably, there is strong indicia that the three corporate Respondents named—Steeplechase, Broadsheet (Colorado), and Sovereign—are corporate alter ego or "shell" entities over which Mr. James exercised complete control and domination.  In fact, Colorado corporate records reflect that all three companies had their principal street address at Mr. James' home prior to his death, 4732 S. Elizabeth Court, Englewood, Colorado.  In addition, all three entities had interlocking registered agents:  the registered agent for Steeplechase and Broadsheet (Colorado) is listed as being Sovereign; and the registered agent for Sovereign is listed as being Steeplechase, all with addresses listed as 4732 S. Elizabeth Court.  Broadsheet (Colorado) was formed on May 21, 2007—long after the Government purportedly terminated the Agreement—and its status was listed as "delinquent" since November 1, 2009.  Because all three corporate Respondents were under the complete dominion of Mr. James, and all had some involvement in the subterfuge that pervaded the May 2008 sham settlement, it is necessary that the requested subpoenas are issued against all of them.

In addition, the role of Mr. Tisdale, as an attorney closely assisting Broadsheet (IOM) in its business activities throughout performance of the Agreement makes clear that he has no basis to withhold documents relating to the Agreement or Broadsheet (IOM), especially where—as here—the Petitioner *is his former client*, Broadsheet (IOM).  Mr. Tisdale acted in a confidential capacity for Broadsheet (IOM) when he acted to trace and pursue assets of Targets.  Mr. Tisdale's role was not as a personal counselor for Mr. James.  Indeed, Mr. Tisdale's duty is to

Broadsheet (IOM), and any personal allegiances he may harbor for Mr. James are irrelevant as to whether he must release all of Broadsheet (IOM)'s official corporate records.

Although Broadsheet (IOM) already possesses substantial documentation of its claims against the Government, discovery is needed from the Respondents to retrieve the official records of Broadsheet (IOM) and to help prove the merits of Broadsheet (IOM)'s arbitral claims. Furthermore, there is a significant risk that the Estate will dispose of documents bearing on the Agreement, the sham Settlement Agreement with the Government, and—perhaps most importantly—documents showing the asset-recovery work that Broadsheet (IOM) undertook pursuant to Agreement. There can be no doubt that if the noticed arbitration or contemplated BIT arbitration were instead a lawsuit commenced within a U.S. federal district court, the Federal Rules would permit this discovery.

In addition, any documents that would tend to show that the Government colluded with Mr. James to pay any of his sham entities a settlement (that was a fraction of the claimed arbitration award sought) or approve a fraudulent assignment of rights under the Agreement from Broadsheet (IOM) to one of these alter egos of Mr. James would serve to bolster Broadsheet (IOM)'s arguments that the Government acted in bad faith and likely would materially support enhanced damages against the Government. Such documents could only be found within the possession, custody or control of the Respondents and their associated entities and agents, as Mr. James kept secret both the May 2008 sham settlement and January 2005 purported assignment. Without such documents, Broadsheet (IOM) may have no way of determining if bad-faith permeated the Government's side of the sham settlement, or if its involvement was merely negligent in failing to ascertain the identity of its counterparty. For that reason, the discovery

sought is absolutely essential to the foreign arbitration and is well within the scope of the Federal

Rules of Civil Procedure.

**B.** **Respondents Are Not Participants in the Foreign Noticed Arbitration and Would Not Be Participants in the Contemplated BIT Arbitration**

The Estate, Steeplechase, Broadsheet (Colorado), Sovereign, and Douglas M. Tisdale,

Sr., Esq., are not parties to the noticed foreign arbitration, and would not be parties to the

contemplated foreign BIT arbitration, as these claims seek to recover under the arbitration

provision of the Agreement, Clause 7.1, and under the U.K.-Pakistan BIT, respectively.

Moreover, these entities and persons reside in the District of Colorado, outside the jurisdiction of

either arbitral tribunal.  Thus, this is not a situation where "(a) foreign tribunal has jurisdiction

over those appearing before it, and can itself order them to produce evidence."  *Intel Corp.*, 542

U.S. at 264.

**C.** **Bilateral Investment Treaty Arbitral Panels and Private Arbitrators Historically Have Been Receptive To Federal Court Assistance Under Section 1782**

The use of Section 1782 in support of foreign-sited arbitrations is well-accepted.  *In re*

*Oxus Gold PLC*, No. MISC 06-82-GEB, 2007 U.S. Dist. LEXIS 24061 (D.N.J. Apr. 2, 2007)

(Section 1782 applies to UNCITRAL arbitrations); *Ukrnafta v. Carpatsky Petroleum Corp.*, No.

3:09 MC 265 (JBA), 2009 U.S. Dist. LEXIS 109492 (D. Conn. Aug. 27, 2009) (same).  In *In re*

*Winning (HK) Shipping Co.*, the district court found that to the extent that the arbitration forum

at issue was subject to Arbitration Act 1996 (of England), Winning was proceeding before a

"foreign tribunal" and is entitled to seek assistance from the court under Section 1782.  No. 09-

mc-22659, 2010 WL 1796579, *29.  The *Winning* court applied the discretionary factors and

explained that "there has been no evidence or case law submitted that indicates that the foreign

government or court would be unreceptive to United States federal-court judicial assistance." *Id.* at *30. The district court concluded "that the factors weigh in favor of providing assistance to Winning in this matter" and allowed Winning to obtain the discovery that it sought. *Id.* at *29.

Much like in *Winning*, here, nothing suggests that the arbitration tribunal to be established under the Chartered Institute of Arbitrators Rules would not be receptive to assistance of this Court under Section 1782, as it is a foreign arbitral tribunal with its situs in Dublin, Ireland that cannot otherwise order the production of documents from non-parties needed for a full adjudication. *See In re Roz Trading Ltd.*, 469 F. Supp. 2d at 1229 (The court explained that because the Vienna International Arbitral Centre as an international body "must rely on the aid of courts beyond its jurisdiction-such as United States District Courts acting pursuant to § 1782(a)-to enforce its demands and to aid its inquiries, both within and without Austria" it would be "receptive to aid from courts such as [the district court in Georgia].").

However, even if the arbitration tribunal were to indicate that it would not allow the introduction of the evidence sought by this Petition, it would not be determinative and the discovery should nonetheless be permitted. *See Intel Corp.*, 542 U.S. at 265 (holding that a 1782 petition could be granted despite the fact that "[t]he European Commission (hearing the underlying matter) has stated in amicus curiae briefs to this Court that it does not need or want the District Court's assistance"); *In re Roz Trading Ltd.*, 2007 WL 120844 at *2 (N.D. Ga. Jan. 11, 2007) ("The parties do not contend that the (foreign tribunal) has a policy against accepting the aid of U.S. courts. It is thus proper for this Court to grant a § 1782 request, even if the specific panel deciding the underlying dispute would not order similar discovery or ultimately decides not to accept the specific discovery ordered by this Court."); *In re Application of*

*Imanagement Servs. Ltd.*, No. 05-2311, 2006 U.S. Dist. LEXIS 8876, at *8 (D.N.J. Feb. 28, 2006) ("[I]t is sufficient that the applicant intend to offer the evidence to a foreign court. Whether the foreign court will ultimately accept the evidence is beyond th[e] [United States] Court's ability to determine.").

### D.   This Petition Is An Attempt To Obtain Probative and Relevant Evidence For Foreign Proceedings and In No Way Circumvents Foreign Proof-Gathering Restrictions

Precisely because Broadsheet (IOM) is seeking good faith discovery that may not be available in the foreign arbitration, the Court should grant Broadsheet (IOM)'s application to issue subpoenas under Section 1782.  Section 1782 does not require that the information sought be discoverable under the procedures of the foreign tribunal.  *Intel Corp.*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions-reasons that do not necessarily signal objection to aid from United States federal courts.").   Rather, in determining whether a petition is an effort to circumvent foreign proof-gathering restrictions, the consideration for a district court is whether the discovery is being sought in bad faith.  *Minatec Fin. S.A.R.L. v. SI Group Inc.*, No. 08-cv-269, 2008 U.S. Dist. LEXIS 63802, *26 (N.D.N.Y. Aug. 18, 2008) ("The primary issue for us is whether [Petitioner] is pursuing this discovery in bad faith.").  As detailed above, Broadsheet (IOM)'s request for discovery from the Estate and related persons and entities is a good faith effort to obtain probative evidence.  Broadsheet (IOM) is unaware of any restrictions in either the Arbitration Rules of the Chartered Institute of Arbitrators or the contemplated BIT arbitration that would prohibit the discovery it seeks.  Moreover, any relevant evidence developed could be

used in both proceedings as part of the evidence to be presented, for direct examination, or in the cross examination of witnesses.

**E.      The Discovery Requested By This Petition Is Appropriately Focused**

The discovery sought by this Petition focuses primarily on the circumstances surrounding the negotiation, formation, execution, performance, assignment, termination, and breaches of the Agreement between the Government and Broadsheet (IOM), and, secondarily, upon the sham Settlement Agreement between the Government and one or more of Mr. James' corporate alter ego shell entities, as well as any direct or indirect communications or payments involving Mr. James or his associated entities or persons and the Government.   As set forth above, the requested discovery is well within the scope permitted by U.S. courts.   In addition, "[c]onsistent with the statute's modest prima facie elements and Congress's goal of providing equitable and efficacious discovery procedures, district courts should treat relevant discovery materials sought pursuant to § 1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application."   *In re Bayer AG*, 146 F.3d at 195.   In the unlikely event that Broadsheet (IOM)'s discovery into Mr. James' communications could be considered intrusive, any undue intrusion can be mitigated by the Court further tailoring the discovery sought.   *See Metallgesellschaft AG v. Hodapp*, 121 F.3d 77, 80 (2d Cir. 1997) ("[I]t is far preferable for a district court to reconcile whatever misgivings it may have . . . by issuing a closely tailored discovery order rather than by simply denying relief outright.").

**IV.     CONCLUSION**

For the foregoing reasons, Broadsheet (IOM) respectfully requests that the Court enter an Order pursuant to 28 U.S.C. § 1782 granting it leave to serve the Estate, Steeplechase, Broadsheet (Colorado), Sovereign, and Douglas M. Tisdale, Sr., Esq. with subpoenas for the production of documents in the forms annexed to the Petition.

Respectfully submitted this 15th day of September, 2011.

By:    /s/ James K. Lewis
          James K. Lewis, Esq.
          PATTON BOGGS LLP
          1801 California Street, Suite 4900
          Denver, CO  80202
          Phone: (303) 830-1776
          Fax: (303) 894-9239
          E-mail: JLewis@pattonboggs.com
          *Attorneys for Petitioner*

*Of counsel:*

James E. Tyrrell, Jr., Esq.
Lisa Ann T. Ruggiero, Esq.
Patrick C. Gilmartin, Esq.
PATTON BOGGS LLP
The Legal Center
One Riverfront Plaza, 6th Floor
Newark, NJ 07102
Phone: (973) 848-5660
Fax: (973) 848-5601
E-mail: JTyrrell@pattonboggs.com
E-mail: LRuggiero@pattonboggs.com

Kenneth B. Reisenfeld, Esq.
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
Phone: (202) 457-6442
Fax: (202) 457-6315
E-mail: KReisenfeld@pattonboggs.com

*Attorneys for Petitioner*

EXHIBIT LIST

| EXHIBIT REFERENCE | DESCRIPTION |
|---|---|
| A | Agreement between the President of the Islamic Republic of Pakistan through the Chairman, National Accountability Bureau, and Broadsheet LLC (IOM), entered into on 20 June 2000 |
| B | Affidavit of Farouk Adam Khan, 22 Aug. 2010 |
| C | Termination Letter from Kendall Freeman on Behalf of the Government of Pakistan and NAB, 28 Oct. 2003 |
| D | Order Placing Company into Liquidation and Appointing Provisional Liquidator, 7 Mar. 2005 |
| E | Letter of Ahmer Bilal Soofi to William F. Pepper, 30 Mar. 2007 |
| F | Order Releasing Liquidator and Dissolving Company, 2 Apr. 2007 |
| G | Records of Payment of Sham Settlement Amount Between Government of Pakistan and Mr. James, 20 May 2008; 29 Sept. 2008 |
| H | Sham Settlement Agreement, 20 May 2008 |
| I | Affidavit of E. Jerry James in Support of Purported Settlement Agreement, 20 May 2008 |
| J | Articles of Organisation of Broadsheet LLC, 12 May 2000 |
| K | Order Voiding Dissolution, 27 Nov. 2009 |
| L | Second Notice to Arbitrate, 23 Oct. 2009 |
| M | Letter of Baker Botts LLP to Ahmer Bilal Soofi, 21 July 2010 |
| N | Letter of Muhammad Ashfaq Ashraf to Baker Botts LLP, 28 July 2010 |
| O | Letter of Baker Botts LLP to NAB and Ahmer Bilal Soofi, 28 Sept. 2010 |
| P | Colorado Corporate Record Entry for Steeplechase |
| Q | Colorado Corporate Record Entry for Broadsheet LLC (Colorado) |
| R | Colorado Corporate Record Entry for Sovereign |
| S | Colorado Attorney Record for Douglas M. Tisdale, Sr., Esq. |
| T | Letter of R. Harper to W.F. Pepper, 15 July 2011 |